# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| **ROBERT JOHNSON,** individually and on behalf of a class of similarly situated individuals,<br><br><br>**PLAINTIFF,**<br><br>V.<br><br>**BOBCAT COMPANY**, a Delaware Corporation, **DOOSAN INFRACORE BOBCAT HOLDINGS CO., LTD.,** and **DOOSAN INFRACORE CO., LTD.,**<br><br>**DEFENDANTS.** | **CASE NO.:**<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## <u>COMPLAINT</u>

Plaintiff Robert Johnson ("Plaintiff") brings this class action against Defendants Bobcat Company, Inc. ("Bobcat"), Doosan Infracore Bobcat Holdings Co., Ltd., ("Doosan Holdings") and Doosan Infracore Co., Ltd ("Doosan" or "Parent Company") (collectively, "Defendants") on his own behalf, and on behalf of a Class of similarly situated individuals who purchased certain models of Bobcat's compact skid-steer loader ("Loaders"[1]) during 2010 through the present. Plaintiff alleges as follows upon personal

---

[1] The Loaders relevant to this Complaint are the Bobcat S630, S650, S750, and S770 model skid-steer loaders. Unless otherwise specified in the Complaint, "Loaders" will refer to all relevant models.

knowledge as to himself or his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted through counsel.

## I.     INTRODUCTION

1.     Defendants falsely advertised and misrepresented the characteristics and performance abilities of its compact skid-steer loaders to induce Plaintiff and the Class into making misinformed, and ultimately detrimental, purchases; purchases they would not have made absent Defendants' misconduct. Defendants intentionally and/or negligently misrepresented the fuel tank capacity of its skid-steer loaders, engaging in an unlawful marketing campaign that was calculated to gain an unfair advantage over competitors conducting their businesses in a lawful manner. Defendants' improper and misleading statements ultimately led Plaintiff and the Class to purchase skid-steer loaders that failed to perform as promised. As a result, Plaintiff and the Class suffered injuries, including, *inter alia*, decreased value of their Loaders, decreased business productivity, and increased business labor costs.

2.     Plaintiff purchased his Loader with the intent to help grow his snow removal business and to better serve his hundred-plus customers. Plaintiff's decision to purchase a Bobcat-brand skid-steer loader was based on Defendants' advertisements, representations, and affirmations with respect to the product's superior qualities and capabilities for use in snow removal and other similar services, in addition to advertisements and representations of increased fuel tank capacity. These representations, however, proved false.  Instead, Plaintiff incurred damages in connection with his use of

a subpar Loader. Not only does Plaintiff's Loader carry significantly less fuel than advertised, it also came with faulty and incomplete coating that resulted in premature rust.

3.     In the end, while Plaintiff and the Class are owners of Loaders with significantly inadequate fuel tank capacity, rusted metal, and decreased value, the Defendants became unjustly enriched by retaining the profits made on each improper, fraudulent sale of the Loaders. Simply put, Plaintiff and the Class did not receive the benefit of their bargain.

## II.     PARTIES

4.     Plaintiff Robert Johnson is a resident of the State of Minnesota, residing at 5365 Painter Creek Green, Maple Plain, Minnesota 55359.  Since October 2013, Mr. Johnson has been the owner of a Bobcat S650 compact skid-steer loader and was previously the owner of a Bobcat S250 compact skid-steer loader. Mr. Johnson uses his Bobcat S650 loader to perform snow removal services for customers of his business, Robert Gordon Homes, Inc.

5.     Defendant Bobcat Company is a corporation organized under the laws of the State of Delaware, with a principal place of business at 250 East Beaton Drive, P.O. Box 6000, West Fargo, North Dakota 58078-600. Bobcat has appointed The Corporation Trust Company, with a principal place of business at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, as its registered agent for service of process. Bobcat is a subsidiary of Doosan Infracore Bobcat Holdings Co., Ltd.

6.      Doosan Infracore Bobcat Holdings Co., Ltd. is a wholly owned subsidiary of Doosan Infracore Co., Ltd. It is headquartered in Seoul, South Korea.

7.      Doosan Infracore Co., Ltd. is a Korean corporation and the parent of Doosan Bobcat Infracore Holdings Co. Doosan manufactures machinery for construction, including industrial vehicles, diesel engines, power generators, machine tools, factory automation system, and other products, such as armored vehicles for the defense industry.

### III.     JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because this is a civil action between citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.      Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). CAFA's requirements are satisfied in that (1) the members of the proposed Class exceed 100; (1) the citizenship of at least on proposed Class member is different from that of at least one Defendant; and (3) the matter in controversy, after aggregating claims of the proposed Class members, exceeds $5,000,000, exclusive of interest and costs.

10.     Venue is appropriate within this District under 28 U.S.C. § 1391(b) because Defendants transact business within this District, including, but not limited to, the marketing and sale of the Loaders, and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

# IV. SUBSTANTIVE ALLEGATIONS

## A. Bobcat designs, manufactures, and sells compact skid-steer loaders.

11. Bobcat is an American-based manufacturer and a leading provider of compact equipment for use in various markets, from agriculture to construction.

12. Bobcat introduced the world's first skid-steer loader in 1960. Skid-steer loaders are labor-saving vehicles commonly used in the agriculture, construction, and landscaping industries to load and move heavy materials. Since 1960, Bobcat has continued to modify and update its loaders to meet the various individual needs of its customers.

13. Today, Bobcat designs, manufacturers, and sells large-frame loaders in thirteen different models. Bobcat offers a variety of options for customers looking to purchase a compact skid-steer loader, with size, engine, and operational characteristics unique to each model. Bobcat sells its skid-steer loaders in the State of Minnesota through authorized dealerships, including, but not limited to, Lano Equipment Inc., located in Loretto, Minnesota.

14. Consumers can also purchase skid-steer loaders from such companies as Caterpillar, John Deere, and Komatsu.

## B. Bobcat misrepresented certain qualities and characteristics of the Loaders.

15. Bobcat advertises the qualities and characteristics of its Loaders in materials specifically created for the purpose of disseminating product information to consumers throughout the United States. These materials include brochures, information

packets, product specification sheets, warranties, and other promotional materials (hereinafter "promotional materials"). By all accounts, the promotional materials are intended to accurately inform consumers about Bobcat's products, and that is indeed the expectation consumers, including Plaintiff, had for these materials.

16. Bobcat used the promotional materials in connection with the sale and purchase of the Loaders to both Plaintiff and the Class. Bobcat's authorized dealerships throughout the United States, including in Minnesota, circulate the promotional materials to potential consumers; these same materials are also available on Defendants' websites.

17. In contravention of consumers' reasonable expectations, the Bobcat promotional materials contained misleading statements concerning the qualities and characteristics of its Loaders. For instance, starting as early as 2010, Bobcat claimed that its skid-steer loaders "feature[] a superior design that outperforms other brands while maximizing your uptime . . .," with "[i]ncreased fuel capacity [that] gives you more time on the job without stopping to fill up." This statement, which was incorrect and misleading, improperly induced Plaintiff and the Class to purchase the Loaders.

18. Likewise, the Bobcat promotional materials advertised incorrect data concerning the fuel tank capacities of various skid-steer loader models. In particular, the Bobcat S650 loader is advertised as having a fuel tank capacity of 27.2 or 27.3 gallons, depending on the brochure; the Bobcat website advertises a fuel tank capacity of 27.5 gallons for the same model. These numbers, which are incorrect and misleading, improperly induced Plaintiff and the Class to purchase the Loaders.

19. Bobcat promotional materials also advertise a "2-Speed Option" that can "boost top travel speed by as much as 57 percent and reduce the time it takes to travel across a jobsite" as compared to the single-speed option. In particular, customers can purchase a Bobcat S650 loader equipped with the 2-Speed Option, which is advertised as being able to attain a top speed of 12.3 MPH, compared to 7.1 MPH for the single-speed option. These statements, which are likewise false since the speed linkage was not adjusted correctly by Bobcat, were made with the sole purpose of inducing customer reliance and were in fact relied upon by Plaintiff and the Class in purchasing the Loaders.

20. Bobcat also promoted the Loaders for use in providing snow removal services. According to the Bobcat website, "[w]hen customers count on you to get their snow removed, you need equipment you can count on. . . Bobcat machines are ready to tackle your toughest contract snow removal jobs." "Even tough conditions like heavy snow, wet slush, and hard ice are no match for tough Bobcat machines and attachments."

21. Bobcat's affirmative representations that the Loaders were of superior quality and possessed certain characteristics and capabilities were the exact representations Plaintiff and the Class relied on in purchasing their Loaders – that Bobcat skid-steer loaders are equipment that can be counted on. But Bobcat misled Plaintiff and the Class concerning Loaders' qualities, characteristics, and capabilities, and therefore performance abilities, to the detriment of both their checkbooks and potential business growth.

**C.  Plaintiff purchased his Loader based on Bobcat's misrepresentations in the promotional materials.**

22.  On October 15, 2013, Plaintiff entered into a contract for the sale and purchase of a Bobcat S650 loader from Lano Equipment, Inc., an authorized Bobcat dealership located in Minnesota. Plaintiff purchased the Bobcat S650 loader for use in providing snow removal services for the one hundred-plus customers of his business, Robert Gordon Homes, Inc.  Plaintiff traded in his 2003 Bobcat S250 loader when purchasing the S650 model.

23.  Plaintiff relied heavily on Defendants' misleading promotional materials when assessing the capabilities of his Loader and its potential impact on his snow removal business, as compared to a competitor's skid-steer loader. Specifically, Plaintiff's snow removal route is based on the distance a skid-steer loader can travel before it requires refueling. The Loader appealed to Plaintiff, based on Bobcat's promotional materials, because the further a skid-steer loader could travel on a single tank of fuel, the more customers Plaintiff could serve in a timely fashion; a factor important not only to Plaintiff, but also to potential customers.

24.  Plaintiff decided to upgrade his Bobcat S250 loader to the S650 model based on the S650's advertised larger fuel tank capacity.  The Bobcat S650 loader was – and is still – advertised as holding 27.2 to 27.5 gallons of fuel, depending on the brochure or product specification sheet. Indeed, the "Operation & Maintenance Manual" for Plaintiff's Loader states that it can hold up to 27.2 gallons of fuel. By comparison, the

promotional materials advertised that the 2003 Bobcat S250 loader was capable of holding 25 gallons of fuel.

25.   Therefore, Plaintiff expected an increase of no less than 2.2 gallons of fuel tank capacity based on the advertisements and representations made in the Bobcat promotional materials. Plaintiff's expectations, much like the true fuel tank capacity of his Loader, proved to be off the mark.

26.   Plaintiff discovered, upon running out of fuel in the middle of his snow removal route, that his Loader could hold a maximum of only 19.5 gallons of fuel – almost 6 gallons less than his previous 2003 Bobcat S250 model and 7.7 to 8.0 gallons less than his Loader's advertised fuel tank capacity.  Plaintiff immediately visited Lano Equipment, Inc. to have his new Loader inspected and repaired so that it would hold the amount of fuel advertised by Bobcat.  Searching for a remedy, the dealer switched out the fuel suction tube at least two times but to no avail: the Loader's fuel tank was still limited to a maximum of 19.5 gallons. To reiterate, Plaintiff's Loader held 7.7 to 8.0 gallons less fuel than advertised in Bobcat's promotional materials and reads empty after using only approximately 17 gallons of fuel.

27.   Thereafter, the authorized Bobcat dealership drained the fuel tank entirely, Plaintiff and a Bobcat representative then traveled to an authorized Bobcat filling station, and the Bobcat representative proceeded to fill the fuel tank to its maximum capacity, including the filler neck. This time, the fuel tank held 24 gallons. Nonetheless, this was still 3.2 to 3.5 gallons below the advertised fuel tank capacity for the Loader and a full gallon less than his previous 2003 Bobcat S250 model.

28.   Bobcat has refused to manufacture a fuel suction tube that would allow Plaintiff to access and use the additional 4.5 gallons of fuel at the bottom of his fuel tank. As a result, Plaintiff's authorized Bobcat dealership was forced to "piece together" a new suction tube that would allow Plaintiff to access and use all 24 gallons of fuel in the fuel tank. Despite this, Plaintiff's fuel tank still holds 3.2 to 3.5 gallons less fuel than advertised in Bobcat's promotional materials.  To date, Plaintiff's fuel gauge incorrectly reads empty at approximately 17 gallons based on Bobcat's refusal to recalibrate the fuel gauge.

29.   Upon discovering the inadequate fuel tank capacity of his Loader, Plaintiff sought to determine whether his previous Bobcat S250 loader was similarly defective. Indeed, Plaintiff had a similar problem with the Bobcat S250 loader. Plaintiff made this discovery when he requested that a colleague re-fuel a Bobcat S250 loader and keep track of the precise amount of fuel dispensed. Thereafter, Plaintiff confirmed that the never filled the fuel tank with more than 19 gallons of gasoline. The fuel tank on the Bobcat S250 loader, it turns out, suffers from the same fuel tank capacity shortfall as the S650 model.

30.   Specifically, Plaintiff's 2003 Bobcat S250 loader was advertised as having a fuel tank capacity of 25 gallons. But the 2003 Bobcat S250 loader reached its fuel tank capacity at 19 gallons. That is, the 2003 Bobcat S250 loader had fuel tank capacity 6.0 gallons below the fuel tank capacity advertised in Bobcat promotional materials.

31.   Upon information and belief, Bobcat manufactures only one size fuel tank per frame size. The Bobcat S650 loader and other models with the similar size and/or

frame are incapable of holding a fuel tank larger than the advertised (but inaccurate) 27.2 to 27.5 gallon fuel tank. For instance, all four Bobcat loaders registering a width of 74 inches, which includes the Bobcat S650 loader, are advertised as holding a 27.2 to 27.5 gallon fuel tank. Furthermore, upon information and belief, the Bobcat S250 loader is incapable of holding a fuel tank larger than the advertised (but inaccurate) 23 to 25 gallon fuel tank.

32. Therefore, the issue of insufficient fuel tank capacity is not limited to the Bobcat S650 loader, but also impacts other Bobcat loader models with the similar size and/or frame, in addition to the S250 model. The issue of insufficient fuel tank capacity affects thousands of Bobcat customers.

33. This issue is particularly problematic because, upon information and belief, Bobcat customers are generally unaware of the discrepancy between advertised fuel tank capacities and actual fuel tank capacities due to the manner in which the customers fill their fuel tanks. The owners and operators of the Loaders generally re-fill their Loaders from fuel transfer tanks and are therefore unaware of their Loaders' true fuel tank capacity. By comparison, vehicle operators who re-fill at gas stations, which track the precise amount of fuel dispensed, are aware of the true fuel tank capacities of their vehicles.

34. Defendant admitted that it has misrepresented the fuel tank capacity of the Bobcat S650 loader (and, by extension, loader models with the similar size and/or frame). Despite this admission, Defendant failed to take any remedial action to correct these misrepresentations in either its brochures, specification sheets, or other promotional

materials. As a result, thousands of customers have purchased the Loaders based on a misunderstanding of the true fuel tank capacity.

35. Furthermore, the fuel tank issue is not covered by the Bobcat "12 Month Loader Warranty." Bobcat warrants to the owners of new Bobcat skid-steer loaders that each new loader will be "free from proven defects in material and workmanship with respect to (i) all components of the product . . ." The warranty permits a Bobcat dealer to "repair or replace . . . any part of the Bobcat loader which fails because of a defect in material and/or workmanship during the warranty period. . ." Because the Loaders are not equipped to handle a larger fuel tank, the warranty does not cover this defect in that the fuel tank cannot be repaired or replaced.

36. Plaintiff has also experienced issues with the torque and/or related speed capability of his Loader.

37. Bobcat promotional materials advertise that the S650 can be purchased with a "2-Speed Option," which can travel at a top speed of 12.3 MPH. The "Operation & Maintenance Manual" that accompanied Plaintiff's Bobcat S650 loader states that Plaintiff's loader can attain a top speed of 12.3 MPH. Plaintiff's Bobcat S650 loader travels at a top speed of approximately half of the advertised speed.

38. Plaintiff incurred increased fuel and labor costs as a result of the fuel linkage problem. Plaintiff consumed more fuel while operating the Loader at full throttle, attaining half the advertised speed, for upwards of twice the amount of time than Plaintiff would have operated the Loader had the product been able to reach the advertised top speed.

39.    Upon information and belief, the reduced speed of the Bobcat S650 loader is due to an incorrect linkage adjustment at the Bobcat factory.    As a result, the linkage problem is widespread and therefore impacts the Bobcat Loaders purchased by thousands of Bobcat customers.

40.    On several occasions, Plaintiff notified his Bobcat dealership and the Bobcat headquarters of the issues with respect to the fuel tank capacity of his Bobcat S650 loader.

41.    Specifically, in March of 2014, Plaintiff expressed his concerns with respect to the fuel tank capacity of his Loader to Tim Krahn, a District Sales Manager for Bobcat.

42.    Upon learning of Plaintiff's fuel tank issue and inspecting the Loader, Mr. Krahn offered to refund the cost of Plaintiff's Loader, even though newer models sell for upwards of $8500 more than Plaintiff's Loader.  In the end, Plaintiff spent over $25,000, based on the price of the Bobcat's S650 loader minus the trade-in value of his 2003 S250 model, to have a larger fuel tank so that he could better serve his customers and grow his business.

43.    Plaintiff has also endured additional hardship and expense to ensure that his Loader meets the fuel tank specifications advertised in Bobcat's promotional materials, a measurement of which the Loader still falls considerably short.

**D.    Bobcat allowed for defective coating application on the S650**

44.    The Bobcat S650 loader is also manufactured with a defective coating that fails to cover exposed metal, leading to premature rusting. In fact, Bobcat's promotional

materials include photos that depict skid-steer loaders bearing rust and coating that is flaking. Upon information and belief, this defect also affects other Bobcat skid-steer loader models, including, but not limited to, the Loaders.

45. Plaintiff's Loader displayed rust from the moment it was delivered to his business. Plaintiff raised his concern over the growing rust on his machine and spots of exposed metal, but Bobcat dismissed his concerns, stating that rust should be expected because the Loader is construction equipment. But this is false. Plaintiff did not agree to purchase a rusting Loader with a faulty coating and incomplete paint job simply because the Loader is a piece of construction equipment. Plaintiff bargained for a new Bobcat loader, in both appearance and performance. Indeed, Plaintiff was told he received a lesser value for his s250 on trade-in based on the rust appearing on this loader. Plaintiff, however, did not receive a discount purchase price based on the rust on his S650 Loader.

## V.    CLASS ALLEGATIONS

46. Plaintiff brings this action as a class action on his own behalf and pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following Class:

> All individuals who purchased a Bobcat S650 loader (or a model with the similar size and/or frame), through an authorized Bobcat dealership, from 2010 to the present.

Excluded from the Class are Defendants, the officers and directors of Defendants, successors and assigns, and any entity in which Defendants have or had a controlling interest.

47. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is currently unknown, Plaintiff believes that the total number of Class members can be ascertained through appropriate discovery. Plaintiff believes that there are thousands of members in the Proposed Class. The Class is defined in such a way so that the identity of the Class members is objectively ascertainable, and the identity of the Class members may be confirmed from records maintained by Defendant. Additionally, Class members may be notified of the pendency of this action by mail, using notice similar to that customarily used in consumer protection litigation.

48. Plaintiff's claims are typical of the claims of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Minnesota Prevention of Consumer Fraud Act, breaches of both express and implied warranties, and other applicable law. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has no relevant conflicts of interest with other members of the Class, and has retained counsel competent and experienced in consumer protection class action litigation.

49. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members. Questions of law and fact common to the Class include:

   i. whether Defendant advertised the Bobcat S650 loader (and other models with the similar size and/or frame) as having a fuel tank capacity between 27.2 and 27.5 gallons;

ii. whether the fuel tank capacity of the Bobcat S650 loaders (and other models with the similar size and/or frame) is substantially below the 27.2 to 27.5 gallon capacity advertised by Bobcat;

iii. whether the coating on the Bobcat loaders is defective;

iv. whether the Defendants knowingly and/or negligently misrepresented the Loaders to Class members;

v. whether Defendants' engaged in unfair and deceptive conduct;

vi. whether the value of the Loaders has been diminished as a result Defendants' misconduct.

50. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, and Plaintiff knows of no unusual problems of management and notice. While the aggregate damage to the Class is significant, the damages suffered by individual Class members may be relatively small. The expense and burden of individual litigation thus make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

51. Defendant has acted on grounds generally applicable to the entire Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

# VI.   CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Violations of the Minnesota Prevention of Consumer Fraud Act
### (MINN. STAT. § 325F.68, *et seq.*)

52.   Plaintiff incorporates by reference and re-alleges each and every paragraph alleged above as though fully alleged herein.

53.   Plaintiff is a resident of the State of Minnesota.

54.   Minnesota's Private Attorney General Statute (Minn. Stat. § 8.31, subd. 3a) allows Plaintiff and the Class to bring a claim under Minn. Stat. § 325F.69.

55.   The Minnesota Prevention of Consumer Fraud Act prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby. . ." Minn. Stat. § 325F.69(1). Defendant advertised and represented to Plaintiff and members of the Class that the Loaders possessed certain qualities and characteristics, including, but not limited to, specific fuel tank capacities. Other states across the Country have enacted substantially similar consumer protection statutes which require the same or similar showings of proof, and which prevent the unlawful conduct described herein.[2]

---

[2] *See* Alaska Stat. § 45.50.471, *et seq.*, Ark. Code § 4-88-101, *et seq.*, Colo. Rev. Stat. § 6-1-105, *et seq.*, Conn. Gen. Stat. § 42-110b, *et seq.*, 6 Del. Code § 2511, *et seq.*, D.C. Code § 28-3901, *et seq.*, Fla. Stat. § 501.201, *et seq.*, Ga. Code Ann. § 10-1-393, *et seq.* and Ga. Code Ann. § 10-1-370 *et seq.*, Haw. Rev. Stat. § 480, *et seq.*, Idaho Code § 48-601, *et seq.*, 815 ILCS § 505/1, *et seq.*, Kan. Stat. § 50-623, *et seq.*, Ky. Rev. Stat. § 367.110, *et seq.*, La. Rev. Stat. § 51:1401, *et*

56. Defendants' advertisements and representations with respect to the fuel tank capacities of the Loaders were made in connection with the sale of Loaders to Plaintiff and the Class.

57. Defendants intentionally and/or knowingly misrepresented the true fuel tank capacities of the Loaders to Plaintiff and the Class.

58. Defendants boasted of an "[i]ncreased fuel capacity [that] gives you more time on the job without stopping to fill up," indicating that the Bobcat S650 loader (and other loader models with the similar size and /or frame) held between 27.2 and 27.5 gallons of fuel. Defendants intended for Plaintiff and the Class to rely on, and accept as true, these advertisements and representations with respect to the fuel tank capacities of the Loaders in deciding whether to purchase a Bobcat brand skid-steer loader, and, if so, which model to purchase.

59. Defendants' unfair or deceptive acts or practices were likely to deceive reasonable consumers about the Loaders' true fuel tank capacities and, by extension, the true value of the Loaders. Plaintiff and the Class relied on, and were in fact deceived by,

---

*seq.*, M.G.L. c. 93A, *et seq.*, Me. Rev. Stat. Ann. tit. 5, § 205-A, *et seq.*, Md. Com. Law Code § 13-101, *et seq.*, Mich. Stat. § 445.901, *et seq.*, Missouri Stat. § 407.010, *et seq.*, Neb. Rev. Stat. §§ 59-1601, *et seq.*, Nev. Rev. Stat. § 598.0903, *et seq.*, N.H. Rev. Stat. § 358-A:1, *et seq.*, N.J. Rev. Stat. § 56:8-1, *et seq.*, N.M. Stat. § 57-12-1, *et seq.*, N.Y. Gen. Bus. Law § 349 *et seq.*, N.D. Cent. Code § 51-15-01, *et seq.*, Ohio Rev. Code Sec. 4165.01 *et seq.*, Okla. Stat. 15 § 751, *et seq.*, Or. Rev. Stat. § 646.605, *et seq.*, R.I. Gen. Laws. § 6-13.1-1, *et seq.*, S.C. Code Laws § 39-5-10, *et seq.*, S.D. Code Laws § 37-24-1, *et seq.*, Tex. Bus. & Com. Code § 17.45, *et seq.*, 9 Vt. § 2451, *et seq.*, Va. Code § 59.1-196, *et seq.*, Wash. Rev. Code. § 19.86.010, *et seq.*, W. Va. Code § 46A-6-101, *et seq.*, Wis. Stat. Ann. § 100.18, *et seq.*

Defendants' advertisements and representations with respect to the fuel tank capacities of the Loaders in deciding to purchase them over competitors' skid-steer loaders.

60. Plaintiff and the Class were injured in fact and suffered actual damages as a result of their reliance on Defendants' advertisements and representations with respect to the fuel tank capacities of the Loaders. Defendants' wrongful conduct was the direct and proximate cause of the injuries to Plaintiff and the Class. Because of Defendants' fraudulent conduct, the value of the Loaders has been greatly diminished, as a skid-steer loader with a larger fuel tank is worth more than an otherwise comparable skid-steer loader with a smaller fuel tank.

61. Had Plaintiff and the Class been aware of this defect, Plaintiff and the Class would have either paid less for their Loaders or would not have purchased them at all. Plaintiff and the Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

62. Pursuant to Minn. Stat. § 8.31, subd. 3a, Plaintiff and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota Prevention of Consumer Fraud Act.

## SECOND CAUSE OF ACTION

### Breach of Express Warranty
### (MINN. STAT. § 326.2A-210, *et seq.*)

63. Plaintiff incorporates by reference and re-alleges each and every paragraph alleged above as though fully alleged herein.

64. Defendants marketed and sold their Loaders into the stream of commerce with the intent that the Loaders would be purchased by Plaintiff and the Class.

65. Defendants expressly warranted that their Loaders have higher fuel tank capacity than previous models. Defendants' representations, through their written warranties (included in various advertisements, brochures, and other marketing materials) regarding the quality, characteristics, and capabilities of the Loaders, created express warranties that became part of the basis of the bargain Plaintiff and the Class entered into upon purchasing the Loaders from Defendants.

66. Defendants created express warranties through brochures, product specification sheets, and other promotional materials detailing the qualities and characteristics of the Loaders.

67. Defendants advertised and represented to Plaintiff and the Class that the Loaders possessed certain qualities and characteristics, including, but not limited to, specific fuel tank capacities.

68. Defendants' advertisements and representations were affirmed by a Bobcat representative employed at an authorized Bobcat dealership.

69. Defendants' advertisements and representations with respect to fuel tank capacities were made in connection with the sale of the Loaders to Plaintiff and the Class.

70. Defendants' advertisements and representations with respect to fuel tank capacities constitute a basis of the bargain between Plaintiff and the Class in their purchases of the Loaders.

71.    Plaintiff and members of the Class relied on Defendants' advertisements and representations with respect to the fuel tank capacities of the Loaders in deciding whether to purchase a Bobcat-brand skid-steer loader, and, if so, which model to purchase.

72.    Defendants' Loaders do not conform to Defendants' advertisements and representations.

73.    Plaintiff and the Class were injured as a result of their reliance on Defendants' advertisements and representations with respect to fuel tank capacities of the Loaders. Defendants' wrongful conduct was the direct and proximate cause of injuries to Plaintiff and the Class.

74.    Plaintiff and the Class demand judgment against Defendant for an amount in excess of $5,000,000.00.

## THIRD CAUSE OF ACTION

### Breach of Implied Warranties of Merchantability and Fitness For A Particular Purpose
### (MINN. STAT. § 336.2A-13, *et seq*.)

75.    Plaintiff incorporates by reference and re-alleges each and every paragraph alleged above as though fully alleged herein.

76.    At all times mentioned herein, Defendants manufactured or supplied the Loaders, and prior to the time said Loader was purchased by Plaintiff, Defendants impliedly warranted to Plaintiff that the Loader was of merchantable quality and fit for the use for which it was intended.

77. Plaintiff relied on the promotional materials supplied and published by Defendants and also the statements of Defendants' authorized agents.

78. The Loader, when sold and at all times thereafter, was unfit for its intended use and was not of merchantable quality as warranted by Defendants. Specifically, the Loader was not suited for performing landscaping, construction, snow removal and other similar services. The deficiencies in fuel tank capacities interferes with Plaintiff's and Class members' use of the Loaders to provide landscaping, construction, snow removal and other similar services.

79. The Loader was similarly unfit for its particular purpose. Defendants distributed, marketed, and sold the Loaders to consumers who would consider the size of a fuel tank when purchasing a skid-steer loader. Defendants knew, or should have known, that the Loaders would be purchased by consumers, such as Plaintiff and the Class, who would utilize the Loaders in businesses based on the stated fuel capacities.

80. Plaintiff and the Class relied on Defendants' advertisements, representations, and implied warranties with respect to the fuel tank capacities of the Loaders in deciding whether to purchase a Bobcat-brand skid-steer loaders.

81. Defendants were provided notice of the issues alleged above after Plaintiff himself became aware of his damages as a result of the defective Loader. Notice was duly given to Defendants or Defendants' agents with respect to the breach of implied warranties as a result of Plaintiff's complaints to both Lano Equipment, Inc., an authorized Bobcat dealership, and to Bobcat headquarters.

82. Defendants failed to provide adequate remedy.

83.  As a direct and proximate result of the breach of said warranties, Plaintiff and the Class have suffered and will continue to suffer loss as alleged herein in an amount to be determined at trial in excess of $5,000,000.00.

## FOURTH CAUSE OF ACTION

### Unlawful Trade Practices
### (MINN. STAT. § 325D.13, *et seq.*)

84.  Plaintiff incorporates by reference and re-alleges each and every paragraph alleged above as though fully alleged herein.

85.  Defendants are a manufacturer, marketer, seller, and distributor of the Loaders.

86.  Plaintiff is protected by these statutes as he purchased the Loader in Minnesota and for his business located in Minnesota.

87.  Minnesota Statute § 325D.13 provides that, "no person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise."

88.  By engaging in the conduct described herein, Defendants violated and continue to violate Minn. Stat. § 325D.13 and the similar laws of other states.

89.  Minnesota Statute § 325D.44, subd. 1, provides in part:

a person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

* * *

"(5) represents that goods or services have…characteristics, ingredients, uses, benefits, . . . that they do not have;"

"(7) represents that goods or services are of a particular standard, quality, or grade, . . . if they are of another;" and

"(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."

90. Consumer protection laws of other states make similar conduct unlawful.

91. Where, as here, Plaintiff's claims inure to the public benefit, Minnesota's Private-Attorney General Statute, Minn. Stat. § 8.31, subd. 3a, allows individuals who have been injured through a violation of these consumer-protection statutes to bring a civil action and recover damages, together with costs and disbursements, including reasonable attorney's fees.[3]

92. Defendants used and employed unfair methods of competition and/or unfair or deceptive acts or practices including, but not limited to, the following:

    a. Representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that person has sponsorship, approval, status, affiliation or connection that he does not have;

    b. Representing that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another;

    c. Engaging in other fraudulent or deceptive conduct which created the likelihood of confusion or of misunderstanding; and

    d. Utilizing misrepresentations, knowing omissions, and other sharp business practices to mislead or create a misleading impression regarding the Loaders.

---

[3]As plead above, other states across have enacted substantially similar consumer protection statutes.

93. Defendants knew or should have known that: (1) the Loaders were defective insofar as a consumer could not utilize the advertised fuel capacity; (2) the Loaders were manufactured with a defective coating that prematurely flakes; and (3) and the Loaders were otherwise not as warranted and represented by Defendants.

94. Defendants' misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff with respect to the suitability of the Loader for use in his snow removal business and for other uses common to skid-steer loaders, including the provision of landscaping and construction services.

95. Defendants intended that Plaintiff and the Class would rely on Defendants' misrepresentations, concealment, warranties, deceptions, and/or omissions regarding the suitability of the fuel tank capacities of their defective Loaders.

96. Defendants' conduct and omissions described herein occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the consuming public.

97. The facts concealed or not disclosed by Defendants were material facts in that Plaintiff and any reasonable consumer would have considered them in deciding whether to purchase a Bobcat-brand skid steer loader, and, if so, which model to purchase. Had Plaintiff known the Loaders were incapable of meeting the standards advertised by Defendants, he would not have purchased the Loader or he would have either negotiated additional warranty coverage, negotiated a lower price to reflect the

defect, or simply avoided the defect altogether by purchasing a loader from a competing company.

98. Defendants intended that Plaintiff would rely on the deception by purchasing the Loader, unaware of the undisclosed material facts. This conduct constitutes consumer fraud.

99. Defendants' unlawful conduct is continuing, with no indication that Defendants intend to cease this fraudulent course of conduct.

100. Plaintiff has suffered actual, ascertainable losses and damages by virtue of having purchased the Loader.

101. Defendants have similarly violated the Unlawful Trade Practices Acts of the various states including, but not limited to, California, and these states allow for statutory damages.

102. As a direct and proximate cause of Defendants' violations of the applicable state Unfair Trade Practices and Consumer Protection laws as set forth above, Plaintiff seeks injunctive or declaratory relief prohibiting Defendants from falsely advertising the qualities, characteristics, and capabilities of the Loaders; and, for California residents, all other damages available by statute and law.

## FIFTH CAUSE OF ACTION

### False Advertising
### (MINN. STAT. § 325F.67, *et seq*.)

103. Plaintiff incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint.

104. Minnesota's False Statement in Advertising Act ("FSAA"), Minn. Stat. § 325F.67, provides a cause of action to "any person, firm, corporation, or association" who purchases goods or services through advertising which "contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading." Consumer protection laws of other states make similar conduct unlawful.

105. Where, as here, Plaintiff's claims inure to the public benefit, Minnesota's Private-Attorney General Statute, Minn. Stat. § 8.31, subd. 3a, allows individuals who have been injured through a violation of the FSAA to bring a civil action and recover damages, together with costs and disbursements, including reasonable attorney's fees.

106. By engaging in the conduct herein, Defendants violated and continue to violate Minn. Stat. § 325F.67 and the similar laws of other states.

107. Defendants' misrepresentations, knowing omissions, and use of other sharp business practices include, by way of example:

a. Defendants' fraudulent, misleading, and deceptive statements relating to the true quality, characteristics, and capabilities of the Loaders;

b. Defendants' fraud and misrepresentations by omission with respect to information about the defective nature of the Loaders, the improper design of the Loaders, and Defendants' knowledge of those defects; and

c. Defendants' concealment of the true nature of the Loaders' fuel tank capacities.

d. Defendants' omission of disclosing the Loaders' defective coating that prematurely flakes

108. Defendants, including its agents and distributors, also made untrue, deceptive, and misleading assertions and representations about the Loaders by making and repeating the various statements about the alleged quality, characteristics, and capabilities of the Loaders referenced herein.

109. As a result of Defendants' conduct, Plaintiff has suffered actual damages in that he has purchased the Loader that was defective and worth less than the price he paid. There is an association between Defendants' acts and omissions as alleged herein and the damages suffered by Plaintiff.

110. As a result of Defendants' untrue, deceptive, and misleading assertions and representations about the Loaders, Plaintiff has and will continue to suffer damages that include not only the full cost to replace the Loader, but also include, without limitation, consequential and incidental damages.

111. Defendants have similarly violated the consumer-protection statutes of the various states including, but not limited to, the State of California.

112. Plaintiff and the class have been damaged in an amount in excess of $5,000,000.00.

## SIXTH CAUSE OF ACTION

### Negligence, including Negligent Misrepresentation

113. Plaintiff incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint.

114. Defendants had a duty to Plaintiff to exercise reasonable and ordinary care in the formulation, testing, design, manufacture, and marketing of the Loaders.

115. Defendants breached their duty to Plaintiff by designing, manufacturing, advertising, marketing, and selling to Plaintiff a product that is defective and does not meet the advertised quality, characteristics, and capabilities of the Loaders, and by failing to promptly remove the Loaders from the marketplace or to take other appropriate remedial action.

116. Defendant knew or should have known that the quality, characteristics, and capabilities of the Loaders were not suitable for the intended use as advertised, and was otherwise not as warranted and represented by Defendant. Specifically, Defendants knew or should have known that: (1) the Loaders were defective in that a consumer could not utilize the advertised fuel tank capacity; (2) the Loaders were manufactured with a defective coating that prematurely flakes; and (3) and the Loaders were otherwise not as warranted and represented by Defendants.

117. As a direct and proximate cause of Defendants' negligence, Plaintiff has suffered actual damages in that he purchased the Loader with diminished quality, characteristics, and capabilities than was represented by Defendants. These defect caused damage to Plaintiff's business, including, but not limited to, it's good-will and reputation, and will continue to cause Plaintiff to incur expenses.

118. Plaintiff and the class demand judgment against Defendant for an amount in excess of $5,000,000.00.

## SEVENTH CAUSE OF ACTION

### Unjust Enrichment

119. Plaintiff incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint.

120. Substantial benefits have been conferred on Defendants by Plaintiff and the proposed Class through the purchase of the defective Loaders. Defendants knowingly and willingly accepted and enjoyed these benefits.

121. Defendants either knew or should have known that the payments rendered by Plaintiff were given and received with the expectation that the Loaders would perform as represented and warranted by Defendants. As such, it would be inequitable for Defendants to retain the benefit of the payments under these circumstances.

122. Defendants' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Defendant to retain the benefits without payment of the value to Plaintiff and the Class.

123. Plaintiff and the Class are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

124. As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, Plaintiff and the Class are entitled to damages in excess of $5,000,000.

## EIGHTH CAUSE OF ACTION

### Fraud by Omission

125. Plaintiff incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint.

126. Based on Defendants' material omissions, Plaintiff and the Class did not reasonably expect that the Loaders' quality, characteristics, and capabilities would be inferior to those stated in the promotional materials.

127. Defendants concealed from and failed to disclose to Plaintiff and the Class that: (1) the Loaders' fuel tank capacity was smaller than represented; and (2) the coating intended to protect exposed metal was defective

128. Defendants were under a duty to disclose to Plaintiff and members of the Class the true quality, characteristics, and capabilities of the Loaders because: (1) Defendants were in a superior position to know the true state of facts about their product; (2) Defendants were in a superior position to know the actual design of the Loaders; and (3) Defendants knew that Plaintiff and the Class could not reasonably have been expected to learn or discover that the Loaders were misrepresented in the promotional materials prior to purchasing the Loaders.

129. The facts concealed or not disclosed by Defendants to Plaintiff and the Class are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Loaders.

130. Plaintiff and the Class justifiably relied on the omissions of Defendants to their detriment.

131. The detriment is evident from the true quality, characteristics, and capabilities of the Loaders, which is inferior than advertised and represented by Defendants.

132. As a direct and proximate result of Defendants' misconduct, Plaintiff and the Class have suffered and will continue to suffer actual damages

## NINTH CAUSE OF ACTION

### Fraudulent Inducement

133. Plaintiff incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint.

134. To induce Plaintiff and the Class members purchasing the Loaders, Defendants misrepresented: (1) the true size of the fuel tanks; (2) the quality of the coating; and (3) therefore, the proper purpose and use for the Loaders in businesses.

135. Defendants knew that their representations about the Loaders were false. Defendants allowed their promotional materials to intentionally mislead consumers, such as Plaintiff and the Class.

136. Defendants made these misrepresentations specifically so as to induce Plaintiff's and the Class's purchase of the Loaders.

137. Plaintiff and the Class did in fact rely on these misrepresentations and purchased the Loaders to their detriment. Given the deceptive manner in which Defendants advertised, represented and otherwise promoted the Loaders, Plaintiff and the Class's reliance on Defendants' misrepresentations was justifiable.

138. As a result of relying on Defendants' misrepresentations, Plaintiff and Class members have suffered, and will continue to suffer, actual damages.

## TENTH CAUSE OF ACTION

### Breach of Contract

139. Plaintiff incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint.

140. Defendants and Plaintiff and the Class entered into the contract when the Loaders were purchased.

141. Plaintiff and the Class performed under the contract by paying the purchase price for the Loaders

142. Defendants breached the contract by delivering a product that was substantially different than what Plaintiff and the Class bargained for.

143. Defendants' breach of their contracts with Plaintiff and the Class caused Plaintiff and Class members to suffer damages in the form of purchasing a product of lesser value and/or a product they would never have purchased absent.

144. Plaintiff, individually and on behalf of the Class, seeks damages for Defendants' breach of contract, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment with respect to their Complaint as follows:

1.      Certifying the Class as defined herein;

2.      With respect to all counts, granting compensatory and all other damages allowed by law;

3.      With respect to all counts, awarding Plaintiffs their costs and disbursements in this action, including reasonable attorneys' fees, to the extent permitted by law; and

4.      With respect to all counts, granting Plaintiffs all other relief allowable at law or equity.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated: April 23, 2015 LOCKRIDGE GRINDAL NAUEN P.L.L.P.


By:  s/  Robert K. Shelquist
     Robert K. Shelquist, #21310X
     Rebecca A. Peterson, #392663
100 South Washington Ave., Suite 2200
Minneapolis, MN 55401
Telephone:  612-339-6900
Facsimile:   612-339-0981
rkshelquist@locklaw.com
rapeterson@locklaw.com


Edward Wallace
Amy E. Keller
WEXLER WALLACE LLP
55 W. Monroe Street
Suite 3300
Chicago, IL 60603
Telephone:  312-589-6272
eaw@wexlerwallace.com
aek@wexlerwallace.com


Patrick Burns, #0334054
BURNS LAW FIRM
310 Fourth Avenue South
Suite 5010
Minneapolis, MN 55415
Telephone:  612-875-1022
patrick.r.burns@gmail.com
***Attorneys for Plaintiffs***